Ms. Lentz. Mr. Chief Justice, and may it please the Court, this Court has repeatedly held that a State prisoner cannot obtain habeas relief under AEDPA unless the State Court contravenes or unreasonably applies clearly established Federal law. In this case, there was no clearly established Federal law. Under any interpretation of Carter, Estelle, and Mitchell, this Court has never extended Carter to the selection phase of a capital sentencing trial. Because there is no clearly established Federal law, the Kentucky Supreme Court was well within its authority to resolve this unresolved question in favor of affirming the sentence. Ms. Lentz, could I ask you about what you just said? You said Carter, Estelle, and Mitchell. Those are the three. So Carter says the Fifth Amendment requires that a criminal trial judge must give a no-adverse inference jury instruction when requested by a defendant. That was, of course, not a sentencing case. Then Estelle says we discern no basis to distinguish between the guilt and penalty phases of Respondent's capital murder trial so far as the protection of the Fifth Amendment. So a kind of general view that the Fifth Amendment applies equally in the two. And then Mitchell holds, it basically repeats that from Estelle, and says we must accord the privilege the same protection in the sentencing phase of any criminal case as that which is due in the trial phase. So when you put those together, Carter with Estelle Mitchell, how do you think that there is a gap? Well, there's a gap between Mitchell and Carter. First of all, Mitchell was not a jury instruction case. In Mitchell, while the defendant did plead guilty, she did not plead guilty to all of the conduct. So there were still factors that were being contested. In this case, Mr. Woodall pled guilty to all of the crimes and aggravating circumstances. Mitchell and Estelle were both concerned with protecting the defendant from the prosecution shifting its burden of proof to the defendant. In this case, there was no burden shifting because Robert Keith Woodall had already pleaded guilty to the facts which the prosecutor was required to prove beyond a reasonable doubt to render Mr. Woodall eligible for the death penalty. Sotomayor, do you think it would have been okay for the trial court to instruct the jury that they could use the defendant's silence against him? Would the affirmative statement have been constitutional and not a violation of the Fifth Amendment? I do not think it would have been proper. Under Kentucky law, the attorney could not refer to the Fifth Amendment. Now, I didn't ask about Kentucky law. Do you think the Fifth Amendment permits the judge to have said, use silence? No. I don't. Use silence to punish him because he's just a bad person. I don't think so. Under Federal law, you don't think the judge could say, ladies and gentlemen of the jury, this defendant has already pleaded guilty to a horrible crime. This is a punishment hearing. He has chosen not to testify in this hearing. You are, if you wish, you may take his failure to testify as an indication that he does not have remorse, that he is not sorry. He could have come before you and said, I am terribly sorry. I wish I had never done it.  He has chosen not to testify. You may, if you wish, take that into account in determining whether there is remorse. You can't say that? Oh, absolutely. Well, then your answer should have been otherwise. Well, I guess I interpreted Justice Sotomayor's question a little bit different because she wasn't referring to facts and evidence or to some type of evidence. But your question asks the question about whether silence bears on the determination of a lack of remorse, and Mitchell specifically left that open. In fact, Mitchell was a factual dispute as to how much the witness, the victim, had suffered. How about a statement about that? Well, I don't think there was actually a dispute about how much the victim suffered there. I think you are referring to the testimony of the blood spatter expert where it was clear and he was talking about how the blood was splattered around and it indicated that there had been quite a struggle when the victim's throat was slashed. And the trial defense counsel. But take the hypothetical, Ms. Lenz, that suppose, you know, the prosecutor had said, you just heard testimony from our expert, the blood spattering expert, that the victim's suffering was especially prolonged. And look, the defendant didn't take the stand. Why didn't he take the stand to deny that? All right? So could the prosecutor have said that at the sentencing hearing? Yes, Justice Kagan, the prosecutor could have said that because that is a selection factor. That the fact of whether the victim struggled is not a fact that makes the defendant eligible for the death penalty. So because the prosecutor had no burden of proof on that, the defendant wasn't in jeopardy of having the burden shifted to him. Kagan. So you are suggesting that what we haven't decided, if you will, goes beyond the remorse question of that we talked about in not Mitchell, but is it Mitchell? Mitchell. It goes beyond the remorse question. And you're saying that really in the sentencing hearing, the Fifth Amendment has nothing to do with anything that happens there, essentially, because once the person has been found eligible for the death penalty, a prosecutor and a jury can draw whatever inferences they want. I think that the core purpose of the Fifth Amendment has been protected. Yes, I do. Breyer. What do we do about the relevant pages? It's at 526 U.S., 328 to 330. You probably have read those 17 times. All right. When I looked at those, I saw they reaffirm Estelle, as they quote Estelle. They say its reasoning applies with full force. Estelle says the Court could discern no basis to distinguish between the guilt and the penalty phases of Respondent's capital trial so far as the protection of the Fifth Amendment privilege is concerned. I marked five separate statements in those two pages that came to the same thing. I looked at Estelle. Estelle has to do with the right to no comment that he wanted in respect to a sentencing fact that the jury was going to decide, namely, future dangerousness. Nothing to do with a fact about the crime, a sentencing fact. So then I said, well, what favors you here? What favors you is the last sentence of the first paragraph, 1330, which says, Whether silence bears upon the determination of a lack of remorse or upon acceptance of responsibility for purposes of the downward adjustment provided in 3E11 of the U.S. Sentencing Guidelines is a separate question. It is not before us and we express no view on it. Right. It's, one, not just a sentencing fact, but a state of mind of the defendant, lack of remorse. Two, it's in the Sentencing Guidelines. Three, it is a decision for a judge, not a jury. If it isn't confined, as I just said it, then Mitchell overrules Estelle, what it explicitly denies doing. Here we have sentencing facts, facts about his childhood. He wanted the Estelle instruction. The judge wouldn't give it. That's the argument against you, I think, and I would like to hear your specific response. Well, in Estelle, that sentencing fact was future dangerousness, and the prosecution had to prove that beyond a reasonable doubt in order to make Mr. Smith eligible for the death penalty. That's a very different fact than a factor of what you're speaking about, which would be a selection factor, and the prosecution has to prove that. I thought the facts, what is at issue here, he has put on witnesses that show that he had a bad childhood, and he didn't himself testify about his bad childhood. And in that context, he asked for the no silence instruction. The government did not object. The judge then refused to give the instruction. All right. Now, what's the difference between the facts about how his parents raised him and the fact of future dangerousness in Estelle? The difference is the burden of proof. How his parents raised him is a mitigating circumstance. Mr. Woodall had the burden of proof on mitigating circumstances. The jury was instructed they had to consider the mitigating circumstances. So whether Mr. Woodall testified or not, we assume that the jury followed the instructions and considered the mitigating circumstances. Alito, am I correct, the instruction that was requested but not given was as follows. Quote, A defendant is not compelled to testify, and the fact that the defendant did not testify should not prejudice him in any way. That was the instruction? Yes, sir. So suppose that the you put on evidence of, to show that he was qualified for the death penalty and put on evidence of aggravating factors, and the defense put on absolutely no mitigation evidence. The instruction would say, would it not, that the fact that the defendant did not testify should not prejudice him in any way with respect to the failure to put on any mitigation evidence at all. Is that correct? That's exactly right, Your Honor. That's exactly right. So in essence, it really shifts the burden of proof, Mr. Woodall's burden of proof, back to the prosecution. In this case, of course, the question is even narrower. That instruction would forbid the jury from even taking into account his failure to testify on the one factor of remorse, the one psychological factor of remorse. And if you say that you're not entitled to such an instruction on that, that alone would have been enough to deny the requested instruction. That's exactly right. That's exactly right. And I think the judge indicated that he was incompetent. Could you call him to ask him if he feels sorry? If he has no Fifth Amendment right, could you call him to the stand and ask him, are you sorry? No, Justice Sotomayor, because there are two rulings in Mitchell, and the first ruling in Mitchell says that, said that Mitchell still had the Fifth Amendment right in the sentencing proceeding after the guilty plea. That's the first ruling in Mitchell. But the second ruling in Mitchell then limits that. It doesn't say there are no adverses, no adverse inferences whatsoever that cannot be inferred. It says that no adverse inferences can be inferred on facts and circumstances that the prosecutor is required to prove which increase the penalty range. So there's a difference. So. Ginsburg. Is your position basically that this is in the nature of an affirmative defense and the defendant carries the burden on remorse? And what was the other one that Mitchell saved out, acceptance of responsibility? Yes. Yes, Justice Ginsburg. So if the defendant says nothing, then he hasn't, he hasn't proved the mitigator. That's right. And he bears the burden of proof on that, and he bears the consequences from failing to meet his burden on that. The prosecution has absolutely no burden with regard to mitigating circumstances. So would it be an acceptable and workable rule to say that in a sentencing hearing on any point where the defendant has the burden of proof, the government is entitled to a testimony that silence can be the basis for an adverse inference? Could you repeat the question? Would it be an acceptable, workable rule to say that in a sentencing hearing on any issue where the defendant has the burden of proof, the prosecution is entitled to an instruction that silence can be the basis for an inference against the defendant on those issues? Well, I mean, you have to either say yes or no. If you say no, then I ask why remorse is different. If you say yes, then remorse is included within that. Well, I think no, and remorse is different, because, again, that's a mitigating circumstance upon which Woodall has the burden of proof. I'm sorry. Why don't you just say yes? I don't understand why you're not entitled to the instruction on all issues as to which the defendant has the burden of proof. Well, it makes sense. In a sentencing hearing. It makes sense to not the purpose of the no adverse inference instruction is to protect the defendant from the prosecution shifting its burden of proof. In other words, using his silence to prove one of the elements that the prosecution is required to prove beyond the reasonable doubt. The assumption of my question is that the defendant has the burden of proof on a certain number of issues in the sentencing hearing. As to all of those issues, it seems to me it has to be your position that the government is entitled to the instruction that I described. Or you're just going to stand up and say, well, remorse is different. We need to know what you're arguing. You need to know why remorse is different. Is that what you're asking? That's one way of asking it, yes. Yes. Well, I think it would be the same answer. It's just that remorse is a mitigating circumstance and the prosecution has no burden of proof on mitigating circumstances. That's the defendant's choice as to whether he wants to place evidence in the record regarding any mitigating circumstances whatsoever. Alitoson When a party has the burden of producing evidence on something, isn't the customary way of dealing with that to instruct the jury that the defendant had the burden of producing evidence to show this, rather than just to talk about inferences that can be drawn from their failure, from that party's failure to produce evidence? Well, in this case, the jury was not instructed that Mr. Woodall had the burden of proof on the mitigating circumstances. They were instructed to consider the mitigating circumstances. Scalia They also weren't instructed to draw any inferences, were they? Alitoson No, they were not. Scalia I mean, the issue here is whether you must instruct them not to draw inferences, not whether it anyway. Alitoson Well, the jury was instructed, You shall consider such mitigating or extenuating facts and circumstances as have been presented to you in the evidence and you believe to be true. Now, I suppose they could have been, the mitigating evidence could have been put in by the prosecution, but for the most part they are going to be put in by the defense. So when the judge says, you can consider whatever mitigating evidence has been presented to you, isn't that tantamount to saying that the defendant has the burden of producing evidence of mitigation, if the defendant wants to do that? I don't think it speaks to who has the burden. It just speaks to the fact that they are required to consider. Ginsburg And it wasn't controversial that on mitigating factors the defendant does have the burden. Alitoson He does. He does. That's correct. Ginsburg So is there a difference between a prosecutor saying, Judge, I want you to charge this jury, that they can use defendant's silence against him, or a judge on his own telling the jury that, or the judge as here simply refusing to say, you can't take it into account? Alitoson Well, I do think there is a difference between the prosecution and the court not telling the jury that they can take the defendant's silence into consideration. I do. Kagan Well, where does that difference come from? Because I thought that every time and in every circumstance that we've prohibited an adverse inference, we've also required a requested jury instruction. I don't know of a case or any principle that would suggest that we can tear those two things apart and say, well, look, an adverse inference is prohibited, but no, you don't get an instruction. Alitoson Well, the only situation that I'm aware of that the court has emphasized that it has extended Griffin with this Carter instruction is in the guilt phase where the prosecution is still required to prove guilt. Kagan I guess I'm asking a different question. Do you have any case that suggests that those two things don't go hand in hand? Because my sort of reading of our case law is that they do. Any time we've said an adverse inference is prohibited, we've also said the defendant is entitled to an instruction about adverse inferences if he requests it. Alitoson Well, you've said that in every case but one, I suppose, except for Mitchell, and that's the most important case here. The court in Mitchell said that the jury couldn't infer anything negative from the facts and circumstances of the crime upon which the prosecutor. Breyer Let me go back, just elaborating on that, to Justice Alito's first question. I want to see if this issue is still in the case. He looked at the instruction, and the instruction is just a broad instruction. It says no adverse inference may be drawn from anything. All right? So there seemed to be some objection you had to the breadth of that instruction. So I looked at the instruction. The instruction does say exactly what Justice Alito said, and you have said, it says the instruction is, the defendant is not compelled to testify, and the fact that he does not can be not be used as inference of guilt and should not prejudice him in any way, with a couple of here irrelevant modifications. All right? The instruction I just read you is not from this case. It's from the Carter case. In the Carter case, the Court said that instruction must be given. It must be given at the sentencing phase. So what they did was copy the instruction out of the case, the very instruction that the Court said in Carter the Fifth Amendment requires to be given in the sentencing phase, and that was a noncapital case. So what's the objection to the instruction on its breadth? Not only is it the same, but the government never objected that it was too broad, and the only issues in the case were factual. They were about what happened to him in his childhood, namely, sentencing facts and the instruction that you did read about what they should consider, referred to facts and circumstances. And where in Estelle does it say that matters at sentencing related to facts and circumstances? You don't have to give the very instruction that Carter and Estelle required. All right. I have several things to say. First of all, I disagree with two things respectfully that you said about Carter. The instruction in Carter was different. The instruction in Carter was about guilt, and actually, and Mr. Woodall concedes, they left that part out of this instruction. This instruction says no negative inferences about anything whatsoever. That's not what Carter said. Carter is talking about guilt, and it's limited. And also, the Carter instruction had to do with the guilt phase rather than the sentencing phase. And Estelle was not a jury instruction case and didn't say anything about Carter whatsoever. So Estelle didn't extend Carter at all. And the sentencing aspect. I'm sorry. Mitchell was about sentencing. Yes. Mitchell was about sentencing. And Mitchell is the case, which answers the last part of your question, Justice Breyer. You said where does it say facts and circumstances of the crime. That language is in Mitchell. Mitchell clearly says that no adverse inferences may be made on facts and circumstances of the crime upon which the prosecution has the burden of proof and upon which will increase the sentence. Does Mitchell overrule Estelle? Mitchell, Estelle talks about you apply the same rule to facts and circumstances of the sentence, in a capital case anyway. Well, I don't think Mitchell says that. It's not that broad. Or excuse me, Estelle doesn't say that. Estelle is not that broad. It doesn't speak about a jury instruction. And even Mitchell doesn't say it's – it says something very broad, the Fifth Amendment applies during the penalty phase. But it doesn't make a distinction between the eligibility part of the penalty phase and the selection part of the penalty phase. But in not making that distinction, I mean, it does speak very broadly. And it says, you know, I'm reading another quotation from it, Now, it does have this exception for remorse, or a possible exception for remorse. But with that exception, otherwise it says the rule against adverse inferences applies, doesn't it? Well, the rule against adverse inferences from Carter is all about incrimination and guilt. And in this case, Mr. Woodall's pled guilty to all of the crimes and aggravating circumstances. So his eligibility for the death penalty was already met before the penalty phase even began. And I'm sorry, what was your question? I think my question was just the breadth of these statements about everything that applies at trial with respect to adverse inferences also applies at the sentencing phase with the possible exception of adverse inferences about remorse. That's the way I read the cases. Well, I'm not sure I agree with your reading of the cases, but even if that is the correct reading of the case and that adverse inferences apply to everything but factors such as lack of remorse or downward adjustment in the sentencing guidelines, that leaves a huge hole in Mitchell. You could drive a truck through that hole because, as Justice Scalia pointed out in his dissent in Mitchell, the bulk of what sentencing is about are these other factors, other factors, what kind of childhood he had, mitigation, and all of that sort of thing. So there's still a lot of room, if I may, I'd like to reserve the remainder of my time. Thank you, counsel. Mr. Kamp? Mr. Chief Justice, and may it please the Court, in Estelle, this Court held that there is no basis to distinguish between guilt and penalty phases in a capital trial. Mitchell did not disturb that ruling, did not overrule that ruling. As this Court indicated, the key components of the Mitchell opinion that have been discussed today are from pages 328 to 330, and on those pages are littered with the discussion of what the clear principles of this Court's authority are. For instance, on page 329, the guilt and penalty phases of Respondent's capital murder trial. So far as the protection of the Fifth Amendment privilege is concerned. Ginsburg. But the courts in those cases had a specific issue before it. Its attention wasn't called to what I suggested is in the nature of an affirmative defense. The defendant has the burden to persuade the jury on mitigators. Mitchell, Your Honor, if I may, and just to under Kentucky law, there is, I think Justice Alito sort of spoke to this, or I forget which justice, there is a difference between a burden of production and a burden of proof. And absolutely, a defendant in a sentencing hearing has the burden of production as a proponent of what is going to be their mitigation theory. That's much different than a burden of proof. In this case, Instruction 6, which is found at Joint Appendix page 44, the burden of proof was on the government to establish that the aggravating circumstances, both the statutory aggravating circumstances and the non-statutory aggravating circumstances, had to outweigh the mitigating evidence. Alito, let me give you this example. Let me pretend to be a juror in a Kentucky capital case. And let's assume in this case the prosecution puts on evidence to show eligibility and some evidence of aggravating factors. The defense puts on no evidence of mitigation. Now, the judge tells me, you shall consider such mitigating or extenuating facts and circumstances as have been presented to you in the evidence and you believe to be true, okay? That's Instruction No. 4. I assume that you don't have an objection to that. And then the judge gives the instruction that you requested. A defendant is not compelled to testify, and the fact that the defendant did not testify should not prejudice him in any way. So now I'm back in the jury room and I say, well, now I have to consider mitigating evidence. And, you know, there are a lot of things that could be mitigating in a capital case. I'd like to know about the defendant's childhood. I'd like to know whether the defendant was abused. I'd like to know whether the defendant was remorseful. And I haven't heard anything about this. And I don't know what to do, because the judge told me I should consider the mitigating evidence that's been presented to me. On the other hand, the judge told me that the failure, the fact that the defendant didn't put on any mitigating evidence can't prejudice him in any way. So what am I supposed to do? Well, in that case, again, if there's no mitigating evidence presented, you don't know what Instruction 4 will look like. But taking your hypothetical, and you're in that jury room, if you're given the Carter Instruction, again, it wasn't given in this case. So if you're given that Carter Instruction, all that prohibits is raising a negative inference against the defendant for the failure to exercise his right to testify. That doesn't really do it. It says the fact that he didn't testify and he could have testified about his childhood or about remorse or any of these other things, that shouldn't prejudice him in any way. And that's straight, that's the, that's straight out of the Carter. Well, just tell me what I'm supposed to do as a juror. The judge says, consider the evidence that's put before you, but the fact that the defendant didn't put this evidence before you in the form of his testimony shouldn't prejudice him in any way. I'm pulled in two different directions. I don't know what to do. Well, but he can't, again, I think in your hypothetical that he's presented nothing. And so he can't be penalized again for presenting nothing. And you can't allow the jury to do that. Nothing, zero equals zero. Correct. And the zero just can't be added on to or taken away from. Zero is zero. Not a positive, not a negative. Right. So you can't take away from the zero, create evidence from his silence, just as you can't from his silence outweigh the aggravating circumstances, correct? Correct. But that still doesn't answer Justice Alito's dilemma. You say he can't be penalized for doing nothing. But the juror in Justice Alito's hypothetical says, what am I supposed to do when he didn't present anything and I'm concerned about that? I don't think you've answered the question. In that circumstance, again, he can't, it can't, for instance, Kentucky is a non-Wayne State, so that means that they can, that non-statutory aggravation is on the table, anything they want to consider. And what this Carter instruction would prohibit is preventing his failure to testify, his failure to offer a lack of remorse, to say I'm sorry, which are the natural inclinations of what jurors' natural inclinations, but constitutionally impermissible inclinations, from adding that on to the death sentence scale. And you're right to do that. Ginsburg was there any other, defendant didn't say I'm sorry, was there anything else, did the defendant produce anything else? In the way of remorse? In this case, no. Remorse was not a mitigation theory that was presented by defense counsel. He had a low IQ and a personality disorder. I take it were the mitigating factors. Correct. So in a case where there are witnesses who says there are two mitigating factors, he has a very low IQ and he has a personality disorder, he says nothing. The jurors go in the room. They have to decide, does he have a low IQ and personality disorder, and what weight should we give that as mitigators? This instruction says, jurors, do it. Just when you do it, don't take account of the fact that he himself did not testify. Correct. And that's so that jurors are perfectly clear, I would think. And what I think is difficult for you is just what your friend raised. It is true that the Carter instruction refers to guilt. You took that instruction word for word and you cut out guilt, because this has nothing to do with guilt, right? Estelle says, I would think, that you have a right to a Carter instruction in respect to some sentencing factors, namely, future dangerousness. The last sentence on the page of Mitchell says we are not deciding whether you are entitled to that instruction in respect to other sentencing factors, namely, remorse. So the question for you is why does that thing, that sentence about remorse in Mitchell say that? Why isn't it at least ambiguous about whether your client is entitled to that instruction here? And your response to that is what? My response to that is twofold. One, as this Court was walking through in the opening presentation, Mitchell was not overruled or, I'm sorry, Estelle was not overruled by Mitchell. It relied on Estelle and the Griffin line of cases as the clearly existing authority. When you get to that ---- Kagan Estelle might not have been overruled, but there's a caveat that Mitchell puts in, and it's a caveat about remorse, and that remorse might be different. And the question is why doesn't that caveat suggest, at the very least, that the instruction that you asked for was so broad that it went beyond what this Court has decided, because the instruction that you asked for did not distinguish remorse from other issues that were going to come before the jury at the sentencing phase. So at the very least, it seems, that instruction sort of blows by the question that we have reserved. I have two points, and one is, when this instruction was requested, Mitchell had not been decided. So the slate was Griffin, Carter, Estelle, and Mitchell came out prior to the Kentucky Supreme Court's ruling. So this instruction was based on, you know, without the reservation that exists. Roberts, but then the reservation certainly suggests that at the time the instruction was requested, it wasn't beyond any fair-minded dispute, which is the standard no one's talked about the standard yet. The standard is that what you're complaining about, that the error has to be so well understood and comprehended in existing law to be beyond any possibility of fair-minded disagreement. And it seems to me that if shortly after your instruction was requested, the Court itself said, oh, that's different, we're not talking about that, it certainly suggests that it was a subject of fair-minded disagreement. I think you have to — we have to examine what Mitchell — Mitchell, again, was framed in a — is a Federal Sentencing Guidelines case. And that passage I read earlier from Mitchell, the next sentence is, and although Estelle was a capital case, its reasoning applies with full force here, where the government seeks to use Petitioner's silence to infer a commission of disputed acts. And what this Court was doing was extending Estelle into the Federal Sentencing Guidelines case, and it wasn't at the same time cutting back on Estelle the recognition that the Fifth Amendment applies at the capital sentencing. Our read of that exception, the language, is that whether silence bears upon the determination of lack of remorse or upon acceptance of responsibility for purposes of the downward adjustment provided in the Sentencing Guidelines is a separate question. Roberts. So not only that, your position must be that that is so clear as to be beyond fair-minded disagreement. It's clear that there — that that relates to fair — to Federal Sentencing Guidelines cases or possibly non-capital cases, because this Court didn't simultaneously accept Estelle as a clearly existing law and then cut it. Well, but you're saying it has to be clear, objectively beyond reasonable disagreement to say that when the Court says lack of remorse in a Sentencing Guidelines case, it still thinks there's a different rule for lack of remorse in a selection case such as this. I — but I think the answer is found within Estelle, because Estelle was — was based on the future dangerousness and the psychiatrist that — that — or, pardon me, psychologist that testified in Estelle, his finding of future dangerousness, which is a selection question, which has nothing to do with eligibility. His finding of future dangerousness was based on lack of remorse. Estelle isn't just a compulsion case. There's a component of silence to it. I thought your friend told us that future dangerousness was an eligibility factor rather than a mere selection criteria. It — it — under this Court's — the then-Texas statute as defined by this Court in Jurek, that special circumstances question at that time was a selection factor. It was not an eligibility factor. Eligibility had already been determined. And that's based on this Court's authority of Jurek, and we — and we cited to State v. Brethert in the red brief, which is Texas's description of — of their — of those special circumstances questions at the time. So this Court has applied this — this Fifth Amendment prohibition in a pure sentencing selection occasion. And Estelle deals with — there's a component of silence to it, because the — the psychologist that testified as to the future dangerousness factor relied on the — the silence of the individual, his failure specifically to say, I'm sorry, and express remorse about the actions that he did. And this Court cited that component as part of what the psychologist relied on in making the future dangerousness assessment. So Estelle is not totally — it obviously has a compulsion component, and it's driven by the — the Miranda violation. But there is a component of Estelle which relies specifically on silence and how the — how the psychologist relied on the silent factor in favor of death in — in the selection process. Ginsburg. I'm curious about one facet of this case. This instruction was sought by the defendant. The prosecutor had no objection to it. The judge said, I'm sorry, I'm not going to give that instruction. Is that — is that common in Kentucky, that both parties agree that an instruction should be given, and the judge says, I'm not going to give it? I can't speak — I don't want to speak too broadly for what happens, but it's — I think when both parties usually agree, the instruction is given. But I don't want to stretch it too far and say that on every occasion. And I think it's important because this was a very — the fact that the government didn't object, you know, demonstrates that the instruction should have been given. If he felt that this instruction shouldn't have been given or there was no legal basis for the instruction. Scalia. It doesn't demonstrate anything of the sort. It just means that he didn't object. Well, I think the — Maybe he was a very bad lawyer. Who knows? Scalia. But what it shows is we're going to determine our law on the basis of whether a government lawyer made an objection or not? At most, it shows that he didn't think there was anything wrong with it. Does that mean we have to think there was anything wrong with it? Oh, absolutely not. Absolutely not. And — and — Well, what it may show is that the prosecutor didn't think that it was going to make a difference. And so why raise an objection that could create everything that's happened since then over something that isn't going to make a difference in a case where you have an incredibly heinous crime? The prosecutor may have thought this jury is going to return the verdict that I want anyway, even if this instruction is given. I think that the — You don't think that's a possibility? I think as a lawyer, if you — the basis of your objection or your failure to object is based on what you believe is legally required, especially when you're a prosecutor and you have that added burden of not seeking a conviction or not seeking a death sentence. But I say what we said here, what I've gathered from the record as best we've been able to see it, is in that sentencing hearing, you were there. I was not there. You know it pretty well. Yes. Okay. There were five matters at issue. He had a low IQ, a personality disorder, the child of a troubled home, he had grown up in poverty, he had been sexually abused. All right. All of those things are basically factual matters about his background. Now, in that context, this instruction, which was the Carter instruction without the word guilt, referring to his failure to testify, is — doesn't mention those five things specifically. It doesn't say testify about those five things. But in context, was there anything else in that hearing that the jury could have thought failure to testify referred to? Is there anything else any juror might have thought, oh, he didn't testify about this other thing, too? Was there some other thing there? It doesn't, Your Honor. It just doesn't go to mitigation, because I think that goes to the other thing. That's not what I'm thinking of.  But it goes to the other thing. I'm thinking of what is it that we — is there an issue in this case about whether the instruction on top of whatever other problems it had was too broad? So I'm thinking if that was the only issue, if those are the only issues that this Court has thought of as referring to, we don't have to get into the breadth matter. That's why I ask you, was there something else in that hearing that the jury might have thought, oh, he didn't testify about it? Scalia, trying to help you, counsel. He's got the point, but you have to answer in terms of what the facts are at the hearing. And in this — in this — pardon me — in this circumstance, what the facts that were going on in this hearing, the — that instruction could go to, again, holding his silence as to how in offering a failure — failing to offer an explanation and respond to that. What about remorse? Wasn't remorse at issue? Remorse wasn't put at issue by — by Mr. Woodall. Well, whether it — I mean, the jury doesn't have to take that into account? Isn't it one of the factors? It can be a factor, but it can't — the lack of remorse as a non-statutory aggravator cannot be premised upon his silence. But was his remorse an issue at the hearing? Yes, his lack of remorse, yes, it was. And the answer to that is yes. I'm sorry, so how was it an issue at the hearing? Because that would seem to cut against you very strongly, Mr. Connolly. If remorse is an issue at the hearing, remorse is the very thing that in Mitchell we said we have not decided. And then you have no clearly established law to rely on. And I appreciate that this was before Mitchell rather than after Mitchell, but it suggests that there was always a question about whether Estelle applied to remorse. Estelle dealt with that in the capital context. Again, the distinction that we're drawing from Mitchell is that — that Mitchell did not modify Estelle. It expanded Estelle into a Federal sentencing or other criminal case — cases and did not touch. It remained intact, the prohibition of using silence. Again, Estelle dealt with silence and silence that was used to support a lack of remorse, which was used to support the textual— I'm sorry, it left in — Estelle left intact what? I'm — pardon me, Mitchell left intact Estelle's application at the capital sentencing proceedings. Suppose we read Estelle as saying that on the issue of remorse, it is an open question whether or not the self-incrimination of privilege is applicable. Suppose we read it that way. And suppose we think that in your case remorse was an issue at the penalty phase. Does that not mean that this issue was not clearly decided? That has a bearing on this case. Could you please repeat the first part? Kennedy, suppose we read Mitchell as saying that on the remorse-is-at-issue, it is not settled whether or not there is a Fifth Amendment self-incrimination right, and it is not settled that the defendant is entitled to an instruction about silence, number one. Number two, suppose we think, as I think to be the case, that remorse was an issue in this trial in the penalty phase. Does that not mean that the law is unclear and you are not clearly entitled to an instruction on that issue? I disagree, because these capital sentencing proceedings are not just about remorse or lack of remorse. And what would happen in that circumstance is, right now you have a bright line. And if we accept remorse out of this in the capital sentencing context, there's two problems with that. One, we would have hybrid Carter instructions, and there would be we would have to figure out, all right, which instruction would fit if we looked at the other one. Kennedy, your answer is what the law should be. My question is whether or not at least the law is not open on that point, unsettled. I believe that Estelle settled this, and Mitchell did not cut back on Estelle in the capital sentencing context, and that Estelle imported the no adverse instruction that's required by Carter. Scalia, but you have to go beyond saying, I believe that. What you have to say to prevail here is, not only do I believe it, but no reasonable juror, no reasonable jurist could possibly believe otherwise. Now, do you want to say that? I — pardon me. If we look at Mitchell and we look at the discussion of the no adverse inference at time. No reasonable jurist could say otherwise. One, I don't think — this Court in Williams said that we're not — that AEDPA is not a subjective juror-judge contest. And if you read Mitchell and it talks about this is a product of our existing precedent, this is a rule of proven utility, this is an essential feature of our justice system, the rule was absolutely clear that these no adverse inferences could be used and that no adverse inference could be raised, and that was a rule of proven utility. And all that Mitchell did in that one sentence is reserve a question that may or may not be applicable in Federal sentencing or non-capital sentencing. It did not cut back on Estelle, which said for — that there is no basis to distinguish between the guilt and penalty phases. Roberts So your argument is when Mitchell said whether it applies to lack of remorse or acceptance of responsibility for the sentencing guidelines, that's a separate question. We don't have any view on it. But at the same time, the Court said, well, of course it applies in the other context. Right. This Court — But that's perfectly clear. I mean, if you were arguing the other way, you would say, well, the question is whether it's clearly — if there's a clear difference between lack of remorse in the sentencing guideline case and lack of remorse in the capital case, and everybody knew that. So that when Mitchell just said it doesn't apply to lack of remorse in the sentencing guidelines, nobody would think that meant that there was an open issue on the capital context. I'd — nobody would think it's an open issue, because if you go through the Mitchell opinion and how it builds on the no adverse — no adverse inference and talks about Griffin and Estelle, and then the key language is at 329, although Estelle was a capital case, its reasoning applies with full force here. So this was a pushing forward of Estelle. It wasn't a cutting back on Estelle. How could this be — let's assume that you're right, that there was error. How could it be harmful, given the — that the mitigators, that the aggravators were not in dispute, he had entered a guilty plea? So how was the defendant harmed by the failure to give this instruction? I think in two manners. One is when you're — when it relates to using the right to silence as a penalty, which is the natural inclination of the juror. So they're going to hold his failure to testify against him. And they'll do it twofold. They'll actually put it on a scale. He didn't say that he was sorry. He didn't personally offer remorse. So we're going to consider that as not. Sotomayor, did the prosecutor argue that? No. No, Your Honor. So how would they have put that on the scale? Well, that's the natural — what this Court recognizes, the natural inclinations of what jurors do. And this prosecutor, and it's laid out in our red brief, although technically said I'm not going to argue lack of remorse, but I'm going to do everything but that. So that was clearly where he was pointed. The other — what — the other impact it has is this was a case that there was strong mitigation. This is somebody who's borderline mentally retarded, has a personality disorder which doesn't allow him to function in society. But there's also a strong element of skipper evidence. So when you're asking for a life without parole and you have expert testimony saying this individual is not going to be a danger to correction officers, and you have a jailer that testifies that he is well-mannered and well-behaved and is not a problem at all, and you have the background that he has, this — that's a strong mitigation narrative. And if the defendant doesn't testify in support of that, that undermines that mitigation narrative. So the failure to testify and the failure to offer this instruction has sort of two harms. It's — it's a— Scalia, I do think that made the difference, that the jury would not have condemned your client to death had it not been for the fact that they drew an adverse inference from his gun. They knew all the horrific details of the crime. They had heard all of your mitigating evidence. And you think what tipped the balance, or at least we think it plausibly could have tipped the balance, is this failure to give the no adverse insurance instruction. Absolutely. Really? Absolutely. And this Court considers a death penalty case, all the — any death penalty case has horrible facts. Mr. Komp, did the Sixth Circuit apply the wrong harmlessness standard here? It seemed to apply the standard that would be applicable on direct review rather than on habeas review. Is that correct? I believe that they cited Brecht and they cited O'Neill appropriately. Because it seems to rely primarily on Carter, and Carter applies the Chapman standard, which is, of course, the direct review standard. I think the reference to Carter was to talk about — we're talking about assessing the harmfulness of this error, or the harmlessness of this error in the context of an instruction that wasn't given, where the instruction that's not given prevents negative inferences. So the reference to Carter was to talk about what the natural inclination for the failure to give the instruction is. It was sort of a framework of what's going on. So I don't think it was used in that circumstance. Where — and when they ultimately came to their conclusion, they relied, again, on citing expressly the O'Neill standard. What do you think is the worst adverse inference they might have drawn? I — in this case, I think it's not offering an apology, not saying why, or not explaining how. I think there's so many things that a juror wants to hear, naturally wants to hear, and that's what the basis that this Court held in Carter is, why this instruction is appropriate. Thank you. Roberts. Thank you, counsel. Ms. Lenz, you have 5 minutes remaining. Thank you. I would just like to point out at the beginning of his responsive argument, my colleague was talking about the selection factors in Estelle, and whether they're called selection factors or whatever they're called, the prosecutor had to prove future dangerousness beyond a reasonable doubt in order to render the defendant in that case death eligible. There were three things that the prosecution had to prove, and that was one of them. So those selection factors, or whatever you want to call them, operated as aggravating circumstances for the death penalty. So I just wanted to make sure that the Court is clear on that. Your friend said Jurek reads to the contrary. No, Jurek does not read to the contrary, no. I mean, perhaps he's saying that because of the reference to calling them selection factors. When one speaks of selection factors, one usually doesn't think of death eligibility factors. So my only point is, regardless of the nomenclature, they operated as aggravating circumstances. The prosecution had the burden of proof. Sotomayor, if the only criteria to determine harmlessness is the gruesome nature of the crime, it appears to me that almost every death-eligible case I've come across, gruesomeness is inherent. By your argument, there's never a case in which a defendant can prove a harmful sentencing error. That's not true, Justice Sotomayor, because it would depend on what the violation is, what the error is. I think in this case, when you consider the absence of this prophylactic instruction in comparison with the heinousness of the crimes, the guilty plea, the overwhelming evidence, his prior convictions for sexual abuse, his post-crime conduct, all of it, when you consider that together. Sotomayor, the mitigation was very close to Wiggins. The mitigation was what? Very close to the Wiggins case. I'm sorry? The mitigation evidence offered here was very close to the Wiggins case, similar mitigation. And there we held there was harmful error. I think the mitigation was negligible in comparison to the rest of the crimes. And the other point that I would just like to make is that there was not clearly established law in this case, and the Kentucky Supreme Court's decision was not an unconstitutional case. So I think it's a fair line of disagreement. Thank you. Thank you, counsel. The case is submitted.